Next for argument, we'll hear Building and Realty Institute at all v. State of New York. Well argued by both sides. Thank you. If you please the court. Good morning, Your Honor. Dorothy Finger for the VRI. I would just briefly, very quickly make a few points before we get to some of the substance. First of all, I agree with prior counsel. This was a motion to dismiss, and I think it treated it, the court below treated this as a motion for summary judgment rather than taking all the facts as true, although they made some brief references, and it should have been set down for discovery before a motion for summary judgment would be appropriate. Secondly, unlike the CHIP case, we are not claiming something about earlier legislation. We are only dealing with the HSTPA. We have lived and our clients have lived with ETPA for many years, and we're restricting our claims to the changes. Now, the 1974 ETPA required findings of less than 5% vacancy in order to continue, and that was each municipality, because in Westchester under ETPA, each municipality must opt into the ETPA, and they are required to review and see that there's a less than 5% vacancy rate. This was not done at all in this case, and in fact, the statements by the Honorable Andrew Stewart-Cousins and Carl Hestie that, quote, the power has been tilted in favor of the landlords, and our appreciation goes to the tenant advocacy groups, acknowledges the political motivation, the removal, allegations of the removal of housing units from rent stabilization, but nothing about units from the ETPA, and in fact, there's no evidence that there's been a loss of affordable housing for working families and others in the legislative history. There was nothing about that, and nor were the facts on the ground demonstrating that. Recently, we saw in the news that Yonkers, White Plains, and Nourishell are putting up major construction that have at least 10% affordable housing, and just yesterday, Governor Hochul talked about the funds that she's going to request for the state to build affordable housing, and the county passed legislation with significant funds to be for affordable housing. So without the facts, repealing vacancy decontrol, removal of rent regulations that pass the high rent and high income, which of course does not make housing available to the affordable. I'm not sure whether the argument you are now making is that this is improper under New York law. That is, I thought the argument here were being made as federal arguments. What you are now telling me is that somehow this rent control should not be being applied in New York under New York law because of what New York says. Now, shouldn't that be a case that just brought in the New York courts? I mean, it's an interesting argument that you're making that they are violating what the New York rent control law is under this, but I haven't really seen that as being what has been proposed before, and I'm puzzled. Well, I do believe you. I mean, it's an interesting argument. I'm happy that you think it's interesting, but I think it's more than interesting because I think that they were bound, they're superseding a New York statute, and I don't think they have the right to do that where they use the New York. To be arguing to us, you must be saying that somehow where this does not comply with the requirements of New York law of having each municipality speak to it again, show the need and so on, that that is enough to raise a constitutional argument that this can't be done. And that's a very hard thing to do. Even though the argument with respect to whether New York law has been correctly applied may be a valid one. Well, I think that, if I might, Your Honor, I think the issue is that when they enacted this, they were amending a New York law. So they were impacting a New York law, and therefore I think they needed to stick to and observe the constraints of that law. That would be the best answer that I could give at this point. I would like to, before getting to the individuals, because I know I have to do that, I want to address one of the things about Cedar Point. I know that counsel referred to that in the other argument, and I also am very well aware of the discussion in some of the other cases about Cedar Point. And I would like to point out that in Cedar Point, the argument before said that the difference was that the right to exclude, it was distinguished because it was entry by a third party, outsiders. I think our claim is that since the unit owner or the owner of the properties cannot reject anybody unilaterally, they can't ask about prior nonpayment or other eviction proceedings, and they cannot control the rents upon a vacancy such that the tenants are actually in privity with the state. I know it's a difficult argument, but I think it's something that should be seriously considered. My main thought about that is that the Cedar Point argument will almost certainly have to be met by the prior panels, because, you know, that goes regardless of whether you are attacking simply the changes or attacking the law as it has been changed. So, you know, you can make it to us, but my guess is that that part of the argument is going to have to be dealt with by another panel. Well, okay. I mean, I don't know, but it seems to me that that argument is sufficiently general that it applies what you've just been saying more broadly. Well, in any event, the argument is that we believe that the tenants are actually in privity with the state, and since a co-tenant of somebody who's a senior and they have a co-tenant, that person remains forever, and so does their additional tenant. So there's no right to exclude, and there are limitations on the vacancy. With regard to our specific clients, I think we've outlined the stepping stones, the Jefferson House, all the things that they're required to do and why they can't meet those standards and still make any kind of repairs going forward because of the restraints. They have renovations that were done that now can't be gotten. It eliminates the MCIs and AIAs. Those monies are gone after a certain amount of time, even though the landlord has laid it out. It just disappears, and the lower-than-reasonable rents basically are an interference with the basic Investment Act expectation, and it hamstrings the ability to maintain the building and to receive compensation for building improvements, and it is defeating the purpose of the statute because, in fact, units are being left vacant because landlords are not going to make the investments that they would have to make on many of these control departments when they're not going to recoup the funds. So that is to that extent. I did want to also deal with the co-op conversion briefly. It's not feasible under 2B6 to convert. We didn't get the chance, as was mentioned before, to flesh out a motion to dismiss, but we do need discovery on that, and the fact of the matter is that the reason for conversion is not only because landlords can make more money. In fact, in Westchester recently, there have been very, very few conversions. It's not to make more money. It's not the only reason. Sometimes an owner has owned a building. We keep talking about, well, they bought it at such and such a point with an expectation. Some of these buildings have been owned for many years by the same landlord. They're getting older. They don't have family that wants to take over the business, and they just may not want to operate anymore. They just want to be able to turn it over. So I think the investment-backed expectations of that, the character of the changes, I think all go to the dismissal. I don't know if there are any other questions. I do think our due process claims are valid claims. There are very few homeless in Westchester, and that was not actually documented in the Westchester scenario by anybody, and I'm not saying there are none, but it's not what is seen as a huge problem by any government official there. So it doesn't address the problem that the statute actually says it does. Thank you. We reserve some rebuttal time. Yes, thank you. Hello again, Your Honors. Esther Murduqueva for the State Appellees. I'll start by addressing the ways in which rent stabilization works in Westchester County, just as a matter of fact. What the ETPA, as amended by the 2019 amendments allows, is for individual municipalities to make the determination to opt in to rent stabilization upon a determination that they're in favor of. And the conditions for a housing emergency are provided for in the statute. None of the appellants have actually alleged that any of the 21 communities in Westchester that are operating rent stabilization are operating that system in the absence of a housing emergency. If they did so believe the proper remedy for that would be a proceeding in state court as against that municipality. I would also note that municipalities have a choice to opt out of rent stabilization if they determine that it is no longer appropriate. These are quintessential questions of legislative and political judgment that are appropriate for resolution in the political process and not in a constitutional takings framework. I'd also like to address some of the specific arguments about exit options or limitations on rent increases that are set forth in the HSDPA. As to the limitations on rent increases, these really are just tweaks to formulas about how rents can be calculated that are akin to tweaks that have existed over the decades that rent stabilization has been in effect. With some of the changes, such as the elimination of preferential rent increases, that nearly reverted the system back to the version of the law that existed in 2003. There really can be no argument that there was a reasonable expectation that these provisions would never change or an argument that these changes are so substantial as to upset reasonable investment back expectations or really have an economic impact of the type that is necessary under Penn Central. I think this is an important point in both of these cases. This court's precedent on regulatory takings has been very clear that even substantial diminishments in economic value are not themselves sufficient to negate a regulatory takings claim. And in neither of these cases do you have the kind of facts alleged that would even allow a court to assess whether any economic injury has occurred. None of the appellants have alleged. Didn't the district court vote in focusing solely on the effect, financial effect, and not considering expectations? I don't think the court focused solely on the financial effect. And I do think the court's discussion of the ways in which the rent stabilization scheme has changed over time with some benefits for landlords and benefits for tenants. The discussion went one way. Its holding was a little peculiar in that it focused on one thing. That doesn't mean we can't consider the other. I think regardless of the particular label that the district court used to make its conclusions, the ultimate outcome in analysis was rooted in the fact that the appellants failed to allege any of the three criteria for a pen central claim in order to proceed further. And I will note that in the BRI case specifically, the plaintiffs make no attempt to distinguish between their facial and as applied physical takings challenges. They admit that those are essentially the same and not even sure that they've preserved any as applied regulatory takings claims in their briefs. They have a very conclusory statement on page 45 that says that they bring as applied claims. But they do not discuss those in any way that is necessary to preserve them. And they do not discuss particular expectations that they individually had or particular economic injuries that they particularly suffered. If the court has no further questions, we'll rest in our groups. Thank you. All right. Thank you. Thank you. Thank you, Your Honors. Michael Duke from Salina Gay Ellsberg along with co-counsel from the Legal Aid Society on behalf of the interviewer and her affiliates. I want to make just two very brief points. First, we heard appellants' counsel discuss the renewal obligations and succession rights under the rent stabilization laws or under the UTPA. And I just want to note that those are all restrictions that predate the HSTPA and have really no bearing on this case. Second, I want to touch on the substantive due process claim. The question there is whether the HSTPA, and specifically the provisions challenged here, are rationally related to a legitimate government interest. And in conducting that inquiry, the court looks for any conceivable basis that could support the law, and that's regardless of whether that basis has a foundation in the record. That's the Supreme Court's guidance from Heller v. Doe. But make no mistake here, the record is clear. There were numerous, numerous public hearings before the HSTPA was enacted. And what they found, what the legislature found, was that there was a terrible incentive structure. You could deregulate a property if tenant income hit a certain threshold. So what did that incentivize? It incentivized kicking out poor people in order to put richer tenants in their place. You could deregulate if rent hit a specific threshold. So what did that incentivize? It incentivized driving up rents. And how did they do that? They used vacancy increases. They used longevity increases. They used inflated and unnecessary renovations where they could recapture value through IAIs and MCIs. What the HSTPA did is it closed these loopholes that were being exploited. Now, the landlords, they may not like it. They may think it's ineffective, and they may think they have a better way of dealing with it. But the law is absolutely clear. It is for the political process to resolve that question. It is not for these landlords. Unless you have any further questions, we'll rest on our briefs. Thank you. Thank you. Yes, Ms. Finger? Thank you, Robert. First of all, the question about proceeding against a state court or actually opting out, opting out. Historically, I would just like to bring up something. There was a Mount Vernon case many years ago in which the city council opted out. The tenant organizations were so crazed by that situation that they immediately opted in. So it's a political issue. It's a political issue that gets determined by that. And that carried out again now because the public hearings that were just referred to as being due process, if you look at those hearings, there's no factual testimony. There's nothing that really was based on fact. There are a number, numerous. I have this fact in my office. It's about a foot thick or more, and there is not one person or tenant organization that cited any actual facts. They complained, my landlord did this, my landlord did that, but there was no record of it. But all we tested was just determining whether or not there's a rational basis for the legislative action determination here. The fact that it seems like you're going to the, again, this idea that it wasn't the best decision or perhaps it wasn't thought out well enough in your view. I'm not certain, but, I mean, it's rational basis. You're saying that there's not a rational basis to support this? Yes, because I think the rational basis has to include some proof. And maybe if we had gotten to pass the motion to dismiss, we would have had that proof. But the allegation by a tenant that his landlord mistreated him, that he raised his rent illegally, well, of course, if he raised it illegally, they have recourse as well. But just blatantly unsupportive. My problem with your argument is that that would go to every rent control case that goes back to the ones that the Supreme Court has long upheld the law. That is, they've always said having rent control may be wrong, as most economists say, but there's a rational basis for it. So isn't that, you know, long gone as an argument? Well, I beg to differ in the sense that the rational basis is usually indicated by, you know, vacancy rates or no vacancy rates, the way in which rents have increased or not increased. But there was none of that in this testimony. If they had records that showed any of that, I would agree. But that was not what these hearings produced at all. So in Westchester, there has been no deregulation. So we're not talking about we were asking for total deregulation. I think that the reference to the claim that the facial and applied are the same, that whole argument was meant to indicate to the court that those were the conclusions. The conclusions of both of those arguments and how they impacted on the landlords was the same. It didn't really change. So the references also about RSA that were made by my adversary, this is different from RSA. And I think that's one of the things that we have tried to explain to the court. All right. Any more questions? Thank you for your time. All right. Thank you very much. And thank you to all the counsel on these two cases. We'll take this case under advisement as well.